ORIGINAL

FILED

DEC 3 1 2003

U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AVINO CONSTRUCTION, INC.

Plaintiff,

v.

UNITED STATES,

Defendant.

No. 03-2877C

COMPLAINT

Parties

1. Plaintiff, Avino Construction, Inc. ("Avino"), is a corporation organized and existing under the laws of the State of New York, with its principal place of business located at 339 Larrfield Road, P.O. Box 360, East Northpart, New York 11731.

2. Defendant is the United States acting through the Department of Justice, Bureau of Prisons ("BOP"), located in Washington, D.C.

Jurisdiction

3. This action relates to a Contractual dispute between the parties, and as such the Court has jurisdiction over this action pursuant to the 28 U.S.C. 1491(a)(2) ("Tucker Act").

4. Avino's claim is not pending in any other forum, nor has any action been taken on Avino's Claim by Congress, or by any department or agency of the United States, or in any other judicial proceeding, except as alleged herein.

Background

5. On June 13, 2000, the Northeast Regional Contracting Office of the BOP issued Invitation for Bids ("IFB") No. 21303-001 for the construction of an underground hot water distribution system at the Federal Correctional Institute located in Schuylkill, Pennsylvania.

6. On August 4, 2000, the BOP awarded Contract No. J21303c-007 (hereinafter "Contract"), in the amount of $1,467,300, to Avino based on its bid submitted in response to the subject IFB.

7. The Contract called for Avino to "supply all labor, material, and incidentals to construct a New Underground Hot Water Distribution System as described in the specifications and drawings attached thereto."

8. The Contract contained the following terms and conditions: Site Visit (Construction) (FAR 52.236-27); Differing Site Conditions (FAR 52.236-2); Site Investigation and Conditions Affecting the Work (FAR 52.236-3); Specifications and Drawings for Construction (FAR 52.236-21); Pre-construction Conference (FAR 52.236-26); Changes (FAR 52.243-4); and Termination for Convenience of the Government (Fixed Price) (FAR 52.249-2).

<u>Avino Notifies Defendant of Problems With Contract</u>

9. On August 18, 2000, Avino notified the Contracting Officer of a number of problems it had discovered on the Contract, including: the need for a steel post to support the plastic safety fence; the need for electricity and water at the site; the need to encase underground valves in concrete hand holes with locking lids in order to protect from corrosive soil materials; the need for a storage area inside of the prison fence to expedite the progress of the Contract; the need for Avino's Superintendent and Foreman to use cell phones at the site to manage the job; the need to take photographs at the job site in order to track job progress and identify any potential problems and any changed site conditions; the need for contact information for the

individual at the BOP reviewing material submittals; the need to hand deliver material submittals to expedite the work; the need to meet with the individual at the prison facility who located the existing underground heating pipes and laid blocks of green painted cement to identify the areas where the pipes changed direction; the need to know where the electric power was located for the facility's high mast lights; and guidance on how to get paid for materials delivered and stored on the job site.

10. A pre-construction meeting was held on August 30, 2000 in the Warden's Conference Room at the Schuylkill facility, during which the BOP informed Avino for the first time of the several restrictions that would be placed upon Avino while performing the Schuylkill Prison Project, including but not limited to the following: all material coming into the facility would have to be searched daily; no storage containers would be allowed inside the prison compound; no cell phones would be allowed inside the facility; no photographs of the job site could be taken by the Contractor; material would have to be staged at a remote area outside the site; all materials would have to be inspected daily; any materials not used would have to be removed from the compound and returned to the remote staging area on a daily basis; and all tools and equipment would have to be removed from the compound and returned to a remote staging area on a daily basis.

11. During the August 30, 2000 meeting, Avino advised the Contracting Officer that a preliminary investigation of the job site after the Contract was awarded indicated that the actual lengths of the new steam lines possibly exceeded the lengths shown on the Contract drawings.

12. The Contracting Officer issued a Notice to Proceed to Avino on September 6, 2000.

## Re-Routing of Piping

13. The Contract drawings and specifications were severely defective with respect to the length of the pipe runs, such that Avino could not build to the BOP's drawings or rely on the quantities of pipe indicated thereon.

14. Avino hired Chapman's Surveying, Inc. of Frostburg, Maryland ("CSI"), a licensed land surveyor, to verify the actual length of the new pipe runs. CSI conducted a survey (hereinafter referred to as "the CSI Survey") and found that the BOP's equipment schedule was defective in that it underestimated by some 2,400 feet the length of new pipe needed to complete the project.

15. The CSI survey also indicated that existing ground elevations at the bore site were different than those shown on the Contract drawings. The drawings provided by the BOP with the IFB did not indicate the steep grade which Avino encountered at the site. This was an additional expense that was not, nor could it have been, taken into account when Avino prepared its bid. Avino made both the Contracting Officer and the Engineering Firm on the Project aware of this defect before work on the Contract commenced.

16. Avino also advised the Contracting Officer that a "tie-in" at the prison's boiler plant was considerably different than that which was shown on the project drawings. This differing site condition prompted Avino to file another request for equitable adjustment with the Contracting Officer.

17. On September 25, 2000, Avino's Project Manager informed the Contracting Officer that the size of the steel angle iron that was called for on the specifications to secure the valves and flanges on the fiberglass system would not work with the size of the pipes that were being used. Avino sought permission to use the larger angle iron to secure the valves and flanges.

18. Also on September 25, 2000, Avino's Project Manager sought guidance from the Contracting Officer regarding the BOP's request for bores to be closed off due to security concerns at the prison. The plans and specifications contained no provision for closing off the ends of the bores.

19. Avino's Project Manager also notified the Contracting Officer that Buildings 3, 8A, 8B, 8C, 8D, 10 and 12 did not have the same size pipes shown on the Contract drawings. Additionally, buildings 6, 8A, 8B, 8C, 8D, 11A and 11B all had concrete enclosures around the existing pipes, none which were not depicted on the Contract drawings. These enclosures made it impossible for Avino to connect the new piping to the building's existing piping. Avino and the Contracting Officer agreed that Avino would use reducers to connect to the smaller building piping, and would submit a cost proposal for the difference in materials and labor. This concrete enclosure problem was discussed many times during the Contract. In fact, Avino even submitted a "work around" to the BOP in December, but the BOP never provided direction on how to proceed.

20. Based upon the field survey concluded by CSI, which pointed out several defects in the BOP's plans and specifications, Avino suggested the following changes be made thereto: eliminating the "Z" bend in the piping between Buildings 5 and 6; re-routing the laterals into Buildings 5 and 6 because of interferences not shown on the Contract drawings; re-routing the lateral going into Building 10 because of interferences not shown on the Contract drawings; re-routing the piping around a wooded area east of Building 11B, as the wooded area was not shown on the Contract drawings; and re-routing the laterals running into Buildings 7 and 8C.

21. When boring between Thrust Block 2 and Thrust Block 3, among others, Avino encountered boulders that obstructed the progress of its work. The BOP's plans and

specifications did not depict boulders as sub-grade condition. As such, Avino submitted a cost proposal to the Contracting Officer for removal of the rock and re-grading of the excavated areas of the site. The combined cost proposals for completing this additional work totaled $247,561.80.

22. The Contracting Officer asked Avino to prepare a cost proposal to re-route the piping to Thrust Block 3 as shown on the original Contract drawings.

23. As requested, a cost proposal was prepared and submitted to the Contracting Officer on October 10, 2000. The proposal to re-route the piping to Thrust Block 3 in accordance with the original Contract drawings totaled $58,131.16 (the cost proposal assumed no additional rock/boulder would be encountered while boring the line along the original route).

Avino Seeks Help From BOP

24. On October 11, 2000, Avino submitted a Memorandum to the Contracting Officer identifying the following questions and/or problems on the Contract: in what order would the buildings be hooked up to the new under ground hot water distribution system; Avino would need longer work hours; expedited clearance time was needed to get Avino employees into the compound; an indoor fabrication shop is needed inside the compound; storage of stage materials and tools inside the compound in a secure shipping container would alleviate unnecessary transportation and security checks; a second crew was needed for excavation and piping; excavated rocky soil needed to be hauled away and clean fill/cracker dust brought in; the entire line needed to be excavated and left open; the BOP needed to stop forcing Avino to "hop scotch" around on the project as it was affecting productivity (due to unresolved DSC's, Avino was forced to stop work in some areas and "hop scotch" to other sites); the BOP needed to provide answers to Avino's technical and Contractual questions and resolve site problems in a timely

manner (some problem areas were not addressed by the BOP for weeks at a time, forcing Avino to "hop scotch" between work sites); temporary boilers needed to be installed in each building or, alternatively, two larger boilers – one in the compound and one in the camp – needed to be installed; and the differing site conditions/change order process needed to be expedited (the change orders were taking weeks and months to process).

Steel Plates

25. At some point in mid-October, 2000, the Contracting Officer indicated that she wanted steel plates placed over areas where Avino was demolishing sidewalks, as the demolition was limiting access to buildings. However, the BOP's plans and specifications were silent about maintaining access to buildings, and providing pedestrian bridges or steel plates. In fact, most of the sidewalks that were in the path of the excavation were not shown on the Contract drawings at all.

26. Avino agreed to absorb the cost of the steel plates only, but indicate that it was unwilling to absorb costs associated with the delay in the job while waiting for the steel plates to arrive.

Modifications & Proposed Modifications to Contract

(Bore Locations/Utility Lines)

27. On October 24, 2000, Avino submitted a request to the Contracting Officer seeking a modification to the terms of the Contract with respect to six inch bore locations not indicated in the Contract drawings or specifications. In addition, Avino requested that a modification be provided to allow a twenty-four inch diameter single casing in lieu of two (2) sleeves, as the utility line distribution sheet drawing ("Sheet 10 of 10 Legends") improperly

labeled utilities and structures. Avino's request for modification was for a total amount of $44,608.78, and required 43 additional calendar days to complete the work.

(Concrete Duct Banks)

28. On October 25, 2003, Avino submitted a cost proposal for a Contract modification for additional hand digging and hammering under concrete duct banks found in two locations near Building 2. According to the Contract, the new pipe was to be installed "over" the existing pipe and duct banks. However, the location of the existing pipe lines and duct banks in the area was an unforeseen site condition causing Avino to hand dig and hammer to take the new pipe lines underneath the duct banks. The new piping had to be re-routed, which caused additional delay and cost to complete. This proposed modification was in the amount of $19,615.18, and sought a two-day time extension to complete the additional work.

29. Avino's modification proposal was later voided by the agreement of the parties that Avino would attempt to widen the trench to avoid visible obstacles in the widening process. In so doing, defendant advised Avino that if any additional unforeseen conditions were found, Avino was to stop work and notify the Contracting Officer immediately.

(Additional Re-Routing of Piping)

30. Avino submitted a second cost proposal to defendant for the additional work of having to re-route the pipe runs, this one in the amount of $4,214.73 and requiring a two-day extension of time to complete.

(Expansion Loop – Thrust Block/Thrust Block 18)

31. Avino was also required to hand dig and hammer underneath an existing expansion loop between Thrust Block 7 and Thrust Block 18. This was also an unforeseen

condition requiring additional work and modification to the Contract. The amount of this modification request was for $5,291.76.

32. Based on the information available to Avino, there was no reason to assume that it would become necessary to tunnel underneath the duct banks. Sections 02301-4 and 5 paragraph 3-03 of the Contract specifications, entitled "Excavation, Additional Payments," indicate that additional payments would be made to the Contractor for removal of materials encountered in the course of the work which were not indicated on the drawings. The ducts were an undocumented pathway; therefore, Avino was entitled to a modification for this work.

(Road Bore Internal Casing)

33. Avino submitted a proposal/estimate for a Contract modification for fabrication of a road bore internal casing support design/detail, materials and installation. The bore location that is the subject of this modification proposal was not indicated on the Contract drawings or specifications, nor was it designed or specified.

34. Avino's design was approved by the Contracting Officer's Technical Representative ("COTR") on October 27, 2000.

35. On October 27, 2000, Avino submitted a proposal/estimate for a Contract modification in the amount of $6,687.76 and requested five days additional Contract performance time. This modification was for Avino's design of the road bore internal casing support.

36. Neither design of the system, nor design of the system components was Avino's responsibility under the Contract.

37. By mutual agreement of the BOP and Avino, this proposal for modification was subsequently declared null and void.

(Sidewalk Removal)

38. On October 31, 2000, Avino submitted a proposal/estimate in the amount of $15,948.14 for a Contract modification for removal and replacement of sixteen standard sidewalks (4'-0" x 5'-0" x 4" thick) not depicted or discussed on the Contract plans and specifications. In its proposal, Avino requested an additional five (5) days of Contract performance time for installation of the new walkways.

39. The BOP eventually agreed to complete the repairs to the sidewalks at the sixteen undocumented crossings with its own forces. The BOP also agreed to repair any sidewalk damaged in the completion of the Contract at an area other than the undocumented crossings or the four identified on the drawings with a credit being given to the Contract price for any such repairs.

(Duct Bank – Thrust Block 2/Thrust Block 3)

40. Another proposal/estimate for work performed between Thrust Block 2 and Thrust Block 3 was submitted by Avino on October 31, 2000. The modification was for additional work performed related to the re-routing of pipe because of an undocumented duct bank that was encountered in that area. The additional costs associated with the unforeseen conditions totaled $7,419.58. Avino requested an additional two (2) days Contract performance time.

41. On November 8, 2000, the Contracting Officer denied Avino's proposed modification of October 31, 2002, stating that Xenon's verbal approval of the re-routing of pipe was "with the stipulation that all underground interference with the exception of rock was to be the responsibility of the Contractor," and that Avino had allegedly agreed it had no problem being responsible for the utilities it encountered.

(Additional Sleeve & Bores)

42. On November 1, 2000, Avino submitted a proposal for additional sleeve and bore operations in two separate locations at the job site. The total amount of the proposal was $76,900.62, and Avino requested an additional five (5) days of Contract performance therein due to this constructive change.

43. The sleeve and bores were not part of the Contract drawings or specifications, nor were they designed/detailed, nor specified. These additional bore operations and sleeves were necessary due to unexpected subsurface conditions (i.e. boulders, rather than "rocky soil," lay in the path of the bore, necessitating a modification to the Contract.)

(Underground Boulders)

44. On November 1, 2000, Avino requested a modification of the Contract for additional work, delay, and expense related to undocumented boulders that were encountered while boring the lines between Building No. 9 and Thrust Block 2, and between Thrust Block 3 and Building No. 8C. The amount of boulder encountered in this area of the project site was so extensive that Avino's entire crew had to be dedicated to rock/boulder removal for a period of time. The BOP made no effort to identify rock or boulder prior to their being encountered by the Contractor's crew.

45. Avino never received a soil boring or Soils Report from the BOP Contracting Officer as specified in the Contract.

46. After a new Contracting Officer took over the job, it was agreed between the BOP and Avino that a unit price of $260.00 per cubic yard was appropriate for the removal, hauling, disposal of rock and boulder and replacement with suitable fill material of rock or boulder type material.

(Re-Routing of Piping: Medium Security – Low Security Areas)

47. A job progress meeting was held on November 2, 2000, during which the Contracting Officer requested that Avino submitted a proposal/estimate to re-route 6" pipe from the medium security area to the low security area around the woods on the low security compound.

48. The woods in question were neither depicted nor discussed in the Contract drawings.

49. The amount of this proposal was $20,350.79, and required an additional fourteen (14) days to be completed.

(Main Return Line)

50. Avino also submitted a proposal/estimate to install a 6" main return line in lieu of a 2" main return line in the low security compound. A credit was given or the 2" diameter line.

51. The cost of the proposal was $46,793.40 and an additional fourteen (14) days performance time was requested.

(Re-Routing of Piping: Buildings 10 & 12)

52. On November 8, 2000, Avino submitted a "no-cost" proposal for re-routing 4" laterals to Buildings 10 and 12. This modification was necessary because the original routing of these laterals shown on the Contract drawings did not show the interferences with a radio tower.

(Duct Banks: Thrust Block 24)

53. On December 28, 2000, Avino submitted a proposal in the amount of $11,774.07 for hand-digging and hammering work under two concrete duct banks east of Thrust Block 24. The first duct bank was shown on profile D-D, Sheet 5. However, the profile indicates that the duct bank is below the new pipe and should not have been an obstruction. The second duct bank,

which was approximately three (3) feet below grade, was not depicted or discussed on the Government's plans or specifications whatsoever. Avino also requested an additional five (5) days Contract performance time for the work associated with this proposed modification.

(Valve Station 7 / Thrust Blocks 7, 18, & 18A)

54. At Valve Station 7 and Thrust Blocks 7, 18, and 18A, Avino encountered several differing site conditions.

55. The existing lines pipes and utilities going to Building 8A were depicted on the Government's plans to be located below the proposed new pipes. However, as Avino discovered when it attempted to dig, the pipes and utilities were not as depicted. As a result, Avino was forced to hand-dig under the existing pipes/utilities in order to install the new hot water lines at Building 8A.

56. Avino also encountered a steel-structured poured concrete pedestrian bridge over the swale between the security fence running west to Building 2 which was not depicted or described on the Government's plans and specifications. As such, Avino was forced to have to run the new pipelines north to Building 1, which would require tunneling under the bridge. This differing site condition caused a loss of efficiency for Avino, disrupted its work sequence, and increased its expenses due to performance at a higher cost period (cold winter weather).

57. The amount of the requested modification to the Contract was for $13,850.80 and an extension of ten (10) days time for performance.

58. On January 24, 2001, Avino filed a proposal for Contract modification with the Contracting Officer for road plates to be used at the emergency road behind Building 8C. The Government's plans were defective in this regard in that they failed to depict an emergency road behind Building 8C. Pat Ahearn and Samantha McKenzie of the BOP directed Avino to install

the road plates anyway. This is a Contract modification for which Avino is entitled to an adjustment of the Contract price.

59. On January 24, 2001, Avino also submitted a proposal for Contract modification with respect to installation of insulation on new and existing steel pipes at the Building No. 9 tie-in point. The insulation was neither depicted on the Government's plans nor discussed in its specifications.

60. Also on January 24, 2001, Avino submitted a proposal for Contract modification for the repair of ground wires between Thrust Block No. 2 and Thrust Block No. 3. Two copper ground wires, neither of which were depicted on defendant's drawings nor described in the specifications, were damaged during the excavation of the area.

61. The defective specifications as described hereinabove slowed the progress of the Project and dramatically increased Avino's costs. The Project was originally scheduled to be completed on or about January 12, 2001. However, due solely to the foregoing defective specification issues, differing site conditions, and modifications to the Contract, the completion date was pushed out to April 25, 2001.

Lack of Access to Site

62. In order to maintain access thru a security gate for emergency vehicles between Buildings 7 and 8C, Avino was to complete the work in this area in strict compliance with a sequence discussed and agreed to between Avino and BOP personnel.

63. Neither the security gate nor the access area were shown on the Contract drawings, nor referenced in the project specifications.

64. Due to the defect in the Government's plans and specifications, Avino would be unable to bring any of its heavy equipment in and out of the compound until it had installed and

tested the pipe and backfilled the trench. This procedure would require Avino to do the majority of the work between Building 7 and Building 8C with very small equipment, or by hand, thereby significantly increasing the time that it would take to complete the work.

65. Accommodating this special procedure required an additional thirty days, and added $47,676.99 to the cost of Avino's performance.

Dewatering

66. Defendant unreasonably restricted the time Avino could spend removing rain and ground water from excavated areas at the site. Rather than allowing Avino to dewater the excavation site using industry-accepted methods and procedures, defendant would only allow Avino to dewater during the regular six (6) hour work day. Defendant prohibited Avino from performing any dewatering after 3:30 p.m.

67. These restrictions severely curtailed Avino's ability to proceed with the project in accordance with the original schedule.

68. In accordance with § 02301, Paragraph 3-04 of the Contract, dewatering the project site was supposed to be performed using any of the following methods:

- prevent surface water and subsurface or groundwater from flowing into excavations and from flooding project site and surrounding area;
- do not allow water to accumulate in excavations;
- remove to prevent softening of foundation bottoms, undercutting footings, and soil changes detrimental to stability of sub-grades and foundations;
- provide and maintain pumps, sumps, suction and discharge lines, and other dewatering system components necessary to convey water away from excavations;

- convey water removed from excavations and rainwater to approved collection or run-off areas;
- provide and maintain temporary drainage ditches and other diversions outside excavation limits for each structure; and
- do not use trench (pipe) excavations as temporary drainage ditches.

69. It is Avino's normal practice to use several of the above-referenced dewatering methods, as well as some others, including the following:

- construct temporary ditches to lead rainwater away from the excavated work area;
- construct sumps at low points, install automatic 24-hour electric sump pumps, and discharge any water away from the work areas;
- if any work areas are flooded, they can be pumped prior to the crews' arrival at the job site;
- usually, the laborer must be present throughout the dewatering operations to shift cords, hoses and pump equipment; and
- if a trench is being dug on a sloped surface, the Contractor can excavate beyond the low end of the trench to allow water to flow out of the end of the trench and away from the active work area.

70. Despite the fact that the Contract between Avino and the BOP specifically allowed for all of the Contractor's usual dewatering methods, Avino was not allowed to use the methods during its performance of the Contract. Instead, defendant placed the following restrictions on Avino during performance of the Contract:

- directed plaintiff to leave the low end of the trench open at Valve Station 7 (the trench passes under a security fence (not depicted on defendant's plans and specifications);

- defendant would not allow Avino to run sump pumps all day long. Rather, defendant only permitted Avino to have pumping equipment in the trench during the six (6) hour work day;
- defendant prohibited Avino from using power cords and discharge hoses at night or at any time other than during the six (6) hour work day;
- for an extended period during Avino's performance of the Contract, the BOP would not allow men and equipment to access the work site outside the six (6) hour work day; and
- as of December 20, 2000, defendant allowed Avino's employees access to the site after the 6-hour work period only if it provided eighteen (18) hours notice and agreed to pay Prison personnel overtime to escort the workers while inside the facility.

71. Defendant's prohibitions on continuous dewatering caused Avino to lose partial days of work as the crew was forced to wait for water to be pumped out of the trenches before proceeding with work.

72. On December 16 and 17, 2000, Saturday and Sunday, respectively, a severe rainfall flooded a trench at the site causing over six-hundred (600) linear feet of newly installed and tested pipe to float to the surface.

73. The trench flooded because defendant did not allow Avino to leave the low end of the ditch, which passed under a security fence not shown on the Contract drawings, open when leaving the site for the weekend. Because Avino completely backfilled under the fence at the end of each day's work pursuant to instructions form the BOP, this effectively created a dam trapping water in the trench.

74. Defendant also directed Avino to install new pipe beneath two unmarked duct banks in front of Building 2. To do so, it had to dig the trench deeper in the area creating low

spots in the trench. Ordinarily, sump pumps would have been installed and would have pumped the water out. However, defendant did not allow the water to be pumped out except during the six (6) hour work day.

75. As a result of the foregoing, Avino lost the time and money needed to install the six-hundred (600) linear feet of pipe and trench.

76. In addition, Avino was forced to replace broken and displaced piping at the site which took approximately two (2) weeks to remove and reinstall.

Termination for Convenience

77. Defendant terminated Avino's Contract for convenience on February 22, 2001.

COUNT I

(Termination for Convenience Settlement Proposal Costs)

78. Plaintiff repeats and realleges the allegations in paragraphs 1 through 77 as if set forth fully herein.

79. Plaintiff submitted a termination for convenience settlement proposal to the Contracting Officer on May 30, 2002 in the amount of $226,600.23. The proposal sought reimbursement for the costs explained hereinabove.

80. On February 14, 2002, plaintiff amended its termination settlement proposal to $266,615.95 after a DCAA audit.

81. On November 1, 2002, plaintiff amended its termination settlement proposal further to include a request for equitable adjustment for breach of Contract in the amount $151,338.26 (see Count II below).

82. On or about July 14, 2003, defendant mad a "partial payment" in the amount of $55,213.00 to plaintiff for its termination settlement proposal.

83. On August 14, 2003, plaintiff converted its termination for convenience settlement proposal into a certified Claim in the amount of $205,947.37, which is what was remaining after the July 14, 2003 "partial payment."

84. On October 10, 2003, the Contracting Officer issued a Final Decision on the Termination for Convenience Claim, wherein she denied all but $95,038.00 of plaintiff's costs.

85. As of this day, defendant has failed to make payment to plaintiff for its remaining for convenience costs, including the undisputed amount of $95,038.00.

86. Plaintiff is entitled to compensation for the full amount of $205,947.37 its termination settlement proposal costs.

COUNT II

(Breach of Contract)

87. Plaintiff repeats and realleges the allegations in paragraphs 1 through 86 as if set forth fully herein.

88. Upon information and belief, defendant and Xenon Co. ("Xenon"), defendant's architect/engineering firm on the Project, knew prior to Contract award that the plans and specifications were defective.

89. Upon information and belief, defendant decided to award the Contract with defective plans and specifications so the awardee could identify the extent of the deficiencies to defendant.

90. However, upon information and belief, when defendant finally realized the extent and severity of the deficiencies in the plans and specifications, it decided to terminate Avino's contract for convenience and search for a better deal.

91. Defendant breached its implied duty of cooperation and duty of good faith and fair dealing, and/or acted in bad faith, when it terminated plaintiff's Contract. Defendant either did not have the budget or time to commission a proper survey of the facility, or to develop an appropriate engineering solution prior to putting the Contract out for bid. This is supported by the fact that when engineering problems did arise during the performance of the Contract, defendant directed Avino to produce a revised design to address the problem.

92. During July of 2001, defendant contracted with All-State Boiler to complete the job that Avino had started.

93. Despite the fact that Avino had already completed a large portion of the Contract work, defendant never allowed it an opportunity to bid on the reprocurement Contract.

94. Upon information and belief, defendant incorporated the survey commissioned by Avino into its revised plans and specifications without reimbursing Avino.

95. Upon information and belief, defendant knew prior to award of the Contract to Avino that the Contract plans and specifications were defective and, therefore, that it was highly likely that the Contract would be abandoned before completion.

96. Prison staff advised Avino during performance that defendant had no budget to support Avino's performance of the Contract. This fact manifested itself during performance as there was an insufficient number of guards, and when guards were available, Avino was forced to absorb the cost of paying their overtime. Providing security on the Project appears never to have been considered by defendant prior to putting the Contract out for bid.

97. Defendant did not indicate in the solicitation that there would be severe restraints placed upon Avino during performance. This withholding of superior knowledge was exacerbated by the fact that when Avino was finally advised of the constraints, it was done so on

a piecemeal basis in what appeared to be case-by-case judgment calls by the prison warden. Avino tried to remedy the disruptions to their schedule caused by the security constraints by familiarizing itself with rules and regulations concerning Contractors inside the facility; however, the only documentation that was provided to the Contractor by the BOP to assist in the familiarization process was the same "visitor's guide" that is provided to the general public. It contained no information relating to construction activities.

98. After the BOP terminated the Contract for convenience, it repeatedly told Avino that it had no plans to award a reprocurement contract. However, defendant entered into secret negotiations with a favored Contractor, All-State Boiler, and eventually awarded it the follow-on contract using the information from the Chapman survey procured by Avino.

99. Upon information and belief, defendant never intended to allow Avino to completely perform the Contract.

100. Based on the foregoing, on November 1, 2002, plaintiff amended its termination settlement proposal further to include a request for equitable adjustment for breach of Contract in the amount $151,338.26. As stated in the Claim, defendant breached the Contract with plaintiff since defendant was aware, prior to awarding the Contract to plaintiff, that its plans and specifications were severely flawed and defective, and it was defendant's intention to terminate after plaintiff had identified all of the defects in the plans and specifications through its own research and development efforts, and then to direct the award of the reprocurement Contract to a preferred Contractor.

101. Plaintiff converted the breach request for equitable adjustment into a Claim for the same amount on January 24, 2003.

102. On March 3, 2003, the Contracting Officer issued a Final Decision, wherein she denied all of the costs submitted by plaintiff for the alleged breach of Contract.

103. In addition, plaintiff is entitled to compensation in the amount of $151,338.26 of all of its costs associated with the breach of Contract Claim.

Request for Relief

WHEREFORE, plaintiff respectfully requests that this Court grant plaintiff the following relief:

(1) Enter a judgment against defendant in favor of plaintiff in the amount of $205,947.37 on Count I;

(2) This Court enter a judgment holding that Defendant breached the Contract;

(3) Enter a judgment against defendant in favor of plaintiff in the amount of $151,338.26 on Count II; and

(4) Award Plaintiff the costs of this action, all applicable Contract Disputes Act ("CDA") interest, its attorneys fees after an application has been made under the Equal Access to Justice Act ("EAJA"), and any further relief deemed just and proper by the Court.

Dated: December 29, 2003

Joseph A. Camardo, Jr.
By: Kevin M. Cox
Law Firm of Joseph A. Camardo, Jr.
127 Genesee Street
Auburn, New York 13021
Tel: (315) 252-3846
Fax: (315) 252-3508

Attorney for Plaintiff